ANDREW S. MACKAY, #197074
amackay@donahue.com
KATHLEEN B. FRIEND, #214593
kfriend@donahue.com
DANIEL J. SCHACHT, #259717
dschacht@donahue.com
PADMINI CHERUVU, #301292
pcheruvu@donahue.com
DONAHUE FITZGERALD LLP
Attorneys at Law
1999 Harrison Street, 26th Floor
Oakland, California 94612
Telephone:   (510) 451-3300
Facsimile:   (510) 451-1527

Attorneys for Plaintiff Wixen Music UK Ltd.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| WIXEN MUSIC UK LTD., a UK limited corporation<br><br>Plaintiff,<br><br>v.<br><br>TRANSPARENCE ENTERTAINMENT GROUP INC., a California corporation; DENNIS DREITH, an individual; SHARI HOFFMAN, an individual; and TANIA OLIVEIRA, nee WOODCOCK, an individual; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 2:21-cv-02663-MEMF-MRW<br><br>**MOTION FOR AWARD OF ATTORNEY'S FEES**<br><br>Hrg. Date: October 3, 2024<br><br>Judge:   Maame Ewusi-Mensah Frimpong<br><br>Trial Date:          May 6, 2024 |

# TABLE OF CONTENTS

**ARGUMENT** ...................................................................................................... 3

   I.     WIXEN IS ENTITLED TO ATTORNEY'S FEES UNDER FRCP 37 ....... 3

     A.  Ms. Oliveira's Self-Serving Qualified Admissions to RFA Nos. 3, 9 and 10 Were Proven False .................................................................................. 4

     B.  Plaintiff Proved Ms. Oliveira's Access to Wixen's Trade Secrets, Not Just "Business Information" ....................................................................... 5

     C.  Ms. Oliveira's Multiple Qualifications in her Response to Request No. 9 Were Proven False .................................................................................. 6

     D.  Ms. Oliveira's Qualifications Regarding Emailing Trade Secrets to Herself Were Proven False .................................................................................. 7

     E.  Wixen Disproved Defendants' Denials of Contact with Wixen Clients for the Purpose of Solicitation ....................................................................... 9

     F.  The Court Should Award Attorney's Fees Under the DTSA and the CUTSA ........................................................................................................... 11

     G.  Under a Preponderance of the Evidence Standard, Defendants' Conduct Was Willful and Malicious ....................................................................... 14

       1. *Clear knowledge of Ms. Oliveira's relationship with Wixen and her obligations regarding its trade secrets, along with attempts to deny such knowledge that were not credible* ............................................. 15

       2. *Attempts to hide Ms. Oliveira's employment with TEG and TEG's encouragement and participation in her efforts to use Wixen's trade secrets, which demonstrates recognition that the activities were in violation of Wixen's rights, and conscious disregard of those rights.* ................. 15

       3. *Clear efforts by all Defendants to cover up their activities, both while they were underway and at trial, demonstrating knowledge that the activities were illicit, and intention to carry them out regardless in conscious disregard of Wixen's rights* ....................................................... 17

**CONCLUSION** ................................................................................................. 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ajaxo, Inc. v. E\*Trade Fin. Corp.*,
    48 Cal. App. 5th 129 (Cal. Ct. App. 2020) ...................................................... 13

*United States ex rel. Bibby v. Mortg. Invs. Corp.*,
    323 F.R.D. 424 (N.D. Ga. 2017) ............................................................... 4

*Cadence Design Sys., Inc. v. Avant! Corp.*,
    29 Cal. 4th 215 (2002) ........................................................................... 14

*Cameron v. Las Orchidias Properties, LLC*,
    82 Cal. App. 5th 481 (2022) .................................................................. 12

*ClearOne Commc'ns, Inc. v. Biamp Sys.*,
    653 F.3d 1163 (10th Cir. 2011) ....................................................... 12, 13

*Daniels v. Select Portfolio Servicing, Inc.*,
    246 Cal.App.4th 1150,1172 (Cal. Ct. App. 2016) ................................. 10

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) .................................................. 12

*Mattel, Inc. v. MGA Ent., Inc.*,
    801 F. Supp. 2d 950 (C.D. Cal. 2011) .................................................. 12

*Nat'l Semiconductor Corp. v. Ramtron Int'l Corp.*,
    265 F. Supp. 2d 71 (D.D.C. 2003) .......................................................... 5

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) .............................................................................. 13

*Thalheim v. Eberheim*,
    124 F.R.D. 34 (D. Conn. 1988) ............................................................... 4

*Wang v. Omni Hotels Mgmt. Corp.*,
    No. 3:18-CV-2000 (CSH), 2021 WL 5904021 (D. Conn. Dec. 14, 2021) ................................................................................................... 4

**Statutes**

18 U.S.C. § 1836(b)(3)(C) ........................................................................... 14

18 U.S.C. § 1836(b)(3)(D) ........................................................................... 11

35 U.S.C § 285 ............................................................................................. 13

Cal. Civ. Code § 3426.5 .............................................................................. 11

California Uniform Trade Secrets Act (CUTSA) .......................... 1, 11, 12, 13, 14, 19

Defend Trade Secrets Act (DTSA) .................................................. 1, 11, 12, 13, 14, 19

Uniform Trade Secrets Act ...................................................................... 11, 13, 14

Utah Uniform Trade Secrets Act .................................................................. 12, 13

**Other Authorities**

Fed. R. Civ. P. 36 .......................................................................................... 3, 4

Fed. R. Civ. P. 36(a)(5) ................................................................................... 4

Fed. R. Civ. P. 37 .............................................................................. 1, 3, 4, 5, 19

Fed. R. Civ. P. 37(c) ...................................................................................... 1, 5

Plaintiff WIXEN MUSIC UK LTD ("Wixen") asks that the Court award it attorney's fees following its successful jury trial on two alternative grounds: 1) Wixen asks that the Court award fees pursuant to Rule 37(c) of the Federal Rules of Civil Procedure due to the failure to admit matters requested in Plaintiff's Requests for Admission; and 2) as a prevailing party under the Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA") on the grounds that Defendants "willfully and maliciously misappropriated" Plaintiff's trade secrets.

As discussed below, although the jury in this case did not find willful and malicious misappropriation by clear and convincing evidence, the burden of proof for an award of attorney's fees under the DTSA and the CUTSA is a preponderance of the evidence, and the award of fees rests within the sound discretion of the Court. Under this standard, the Defendants' actions justify an award of attorney's fees.

As to Defendants' responses to Requests for Admission ("RFA"), Wixen seeks recovery of its fees and costs under Rule 37 as to the following responses to Requests for Admissions given by Defendants Tania Oliveira and TEG in this matter (MacKay Decl. Ex. A - D):

**Oliveira's Responses:**

REQUEST FOR ADMISSION NO. 3

Admit that, as part of YOUR employment with WIXEN, YOU has [*sic*] access to WIXEN'S TRADE SECRETS.

RESPONSE TO REQUEST FOR ADMISSION NO. 3

Responding Party objects to the phrases "access to" and "WIXEN'S TRADE SECRETS" as vague, ambiguous and unintelligible. Responding Party further objects to the phrase "WIXEN'S TRADE SECRETS" to the extent that any of the information that WIXEN purports to identify as "trade secrets" does not constitute bonafide trade secrets. Subject to and without waiver of the foregoing objections, Responding Party admits that she had access to WIXEN's business information as part of the regular

course of her employment with WIXEN, including its client list, client contracts and client earning information on an as-needed basis to perform her duties at WIXEN.

REQUEST FOR ADMISSION NO. 8

Admit that, before March 13, 2021, YOU contacted WIXEN'S clients for the purpose of soliciting business from those clients on behalf of TEG.

RESPONSE TO REQUEST FOR ADMISSION NO. 8:

Responding Party denies that she contacted WIXEN'S clients for the purpose of soliciting business from those clients on behalf of TEG.

REQUEST FOR ADMISSION NO. 9

Admit that YOU assisted WIXEN'S clients with terminating their contracts with WIXEN despite those clients missing the termination deadline.

RESPONSE TO REQUEST FOR ADMISSION NO. 9:

Admit that, when Jane [*sic*] Clewer and Bruce Gaitsch terminated with WIXEN, they emailed Responding Party on March 10, 2021, and Responding Party saved the termination notice under the date of March 1, 2021 to accommodate the request of Janey Clewer and Bruce Gaitsch. They had both verbally terminated on the phone in time, and at the time Bruce Gaitsch said his arm was broken, and that it would take him longer than normal to send a written termination. Consequently, when the termination email arrived, it was days late. Further admit that, during 2020, WIXEN had released several clients earlier than stated in their contracts, and that Responding Party was following this precedent set by WIXEN in regard to the termination requested by Jane Clewer and Bruce Gaitsch.

REQUEST FOR ADMISSION NO. 10

Admit that YOU emailed WIXEN'S TRADE SECRETS from YOUR WIXEN email account to YOUR personal email account.

RESPONSE TO REQUEST FOR ADMISSION NO. 10:

Responding Party objects to the phrase "WIXEN'S TRADE SECRETS" as vague, ambiguous and unintelligible. Responding Party further objects to the phrase

1  "WIXEN'S TRADE SECRETS" to the extent that any of the information that
2  WIXEN purports to identify as "trade secrets" does not constitute bonafide trade
3  secrets. Subject to and without waiver of the foregoing objections, Responding Party
4  admits that from time to time, in order to perform her duties at WIXEN (including as
5  a result of WIXEN'S unreliable server and software which frequently crashed making
6  it otherwise impossible for her to fulfill her duties), out of necessity she emailed
7  certain limited client information to her personal email account solely to perform her
8  duties at WIXEN.

9  **Responses by TEG:**

10  REQUEST FOR ADMISSION NO. 8

11  Admit that, before March 13, 2021, YOU contacted WIXEN'S clients for the
12  purpose of soliciting business from those clients on behalf of TEG.

13  RESPONSE TO REQUEST FOR ADMISSION NO. 8

14  Deny that WIXEN's clients were contacted for the purpose of soliciting
15  business from those clients on behalf of TEG.

16  **ARGUMENT**

17  **I.    WIXEN IS ENTITLED TO ATTORNEY'S FEES UNDER FRCP 37**

18  Federal Rule of Civil Procedure 37 provides for the mandatory recovery of
19  attorney's fees where a party "fails to admit what is requested under Rule 36 and if
20  the requesting party later proves . . . the matter true" unless responding party
21  demonstrates that the request was held objectionable, the admission was "of no
22  substantial importance," that the responding party "had a reasonable ground to
23  believe that it might prevail on the matter," or other good reason for the failure to
24  admit. Here Ms. Oliveira and TEG have provided either outright denials (Requests
25  for Admission 8 relating to solicitation of Wixen's clients); or in the case of Ms.
26  Oliveira have provided qualified responses that attempt to reframe the Requests in
27  self-serving ways. In many instances, not only did these responses require Plaintiff
28  to disprove the portion denied, but to also address the portion admitted, since the

qualifications were in many cases also, false. The five RFAs at issue represent topics that required significant devotion of Wixen's time and resources to prove the truth of the underlying request—as written—not as Defendant's chose to interpret them in order to attempt to evade liability. An award of attorney's fees is more than warranted under Rule 37.

### A.   Ms. Oliveira's Self-Serving Qualified Admissions to RFA Nos. 3, 9 and 10 Were Proven False.

In response to RFA Nos. 3, 9, and 10 addressing respectively access to Wixen's trade secrets during her employment, the backdating of termination notices, and Ms. Oliveira's transfer of Wixen data to herself by email Ms. Oliveira in each case provided a self-serving qualified response. Although Rule 36 permits parties to qualify a response in response to a request that "contains assertions which are only partially correct, a reviewing court should not permit a responding party to undermine the efficacy of the rule by crediting disingenuous, hair-splitting distinctions whose unarticulated goal is unfairly to burden an opposing party." *Thalheim v. Eberheim*, 124 F.R.D. 34, 35 (D. Conn. 1988), (internal citations omitted). For example, in *Wang v. Omni Hotels Mgmt. Corp.,* No. 3:18-CV-2000 (CSH), 2021 WL 5904021, at *9 (D. Conn. Dec. 14, 2021) where the defendant responded to a request for admission by providing an "essay in reply" through which it employed its response to argue its own theory of the case and provide facts outside the parameters of the underlying Request, the response was deemed non-responsive to the substance of the matter as required by Rule 36(a)(5), rather than a good faith qualification. Similarly, in *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 323 F.R.D. 424, 431 (N.D. Ga. 2017), a qualified response to an RFA asking a defendant to admit that various forms of compensation were not approved by the shareholders, admitting only that that approval was not "specifically and directly" given, and then adding "unsolicited general information as to the propriety of its

actions" was deemed an inappropriate qualification because the addition of the qualifiers changed the substance of the request.

Moreover, such inappropriate qualifications do not insulate the responding party from the imposition of attorney's fees and costs under Rule 37(c). To the contrary, when a qualified denial or admission forces the requesting party to prove the invalidity of the qualification, Rule 37's cost shifting remedy, rather than a motion to compel a further response, is the appropriate remedy. *Nat'l Semiconductor Corp. v. Ramtron Int'l Corp.,* 265 F. Supp. 2d 71, 74–75 (D.D.C. 2003) ("the validity, or bona fides, of a qualified answer to a request for admission must await the trial to see if the party forced to prove what was not admitted can meet the requirements of" Rule 37(c)). Many of Ms. Oliveira's qualifications are in this vein.

### B.     Plaintiff Proved Ms. Oliveira's Access to Wixen's Trade Secrets, Not Just "Business Information"

In response to RFA No. 3, Ms. Oliveira admitted that she had access to certain Wixen "business information" including "client list, client contracts and client earning information," but denied that this information constituted a legitimate trade secret. That contract information and client earnings constituted trade secrets was undeniably proven in this case, with the jury ruling that both were bona fide trade secrets. (ECF 220, Verdict Forms No. 1B-1C). Furthermore, *prior to trial*, the Court issued findings of fact and *sua sponte* granted summary judgment in Wixen's favor that Wixen's client names and contact information constituted a trade secret based on the "undisputed facts" that Wixen was entitled to partial summary judgment on the question of whether its client names and contact information constituted a trade secret. (ECF Nos. 103 at p. 17; 104 at p. 3:15 and 4:14-15). Defendant nevertheless left her qualified admission unchanged. Because of Defendant's refusal to admit that the "business information" identified in her response constituted legitimate trade secrets, Plaintiff was forced to spend significant time at trial (and in opposition to Defendants'

summary judgment motion) proving that what Ms. Oliveira terms "business information" was a trade secret.[1]

### C. Ms. Oliveira's Multiple Qualifications in her Response to Request No. 9 Were Proven False

In response to Request No. 9, Ms. Oliveira admitted to providing "assistance" consisting solely of "sav[ing] the termination notice under the date of March 1, 2021 to accommodate the request of Janey Clewer and Bruce Gaitsch."   All the qualifications embedded in this phrase were disproven:  Ms. Oliveira did not merely provide assistance to Janey Clewer and Bruce Gaitsch in backdating their contract terminations.  Also receiving such assistance was Mick Lister.  Further, although Ms. Oliveira attempted to qualify the limits of her assistance as simply "saving the termination notice" under an earlier date, the actual evidence demonstrated her assistance to be far more involved.   What Ms. Oliveira actually did was to create forged emails from Mr. Lister, Mr. Gaitsch and Ms. Clewer that appeared to have been sent on an earlier date.  (May 8, 2024 Transcript, (PM Session) at 71:21-72:12; 73:2-75:14; 76:11-16; May 9, 2024 Transcript, Vol 1 at 32:24-37:3; Trial Exs. 27, 28, 29, 32, 33, 73). She also provided additional assistance not acknowledged in her admission by ghostwriting Mr. Lister's termination email.  (May 9, 2024 Transcript, Vol 1 at 32:24-33:18; Ex. 73).

Finally, Ms. Oliveira's attempt to qualify her forgeries of the Clewer/Gaitsch termination notice as occurring at the request of the clients was demonstrated at trial to be completely untrue.  Not only was there no evidence that Mr. Gaitsch and Ms. Clewer made a request to backdate their terminations, what the evidence actually

---

[1] Nor are Ms. Oliveira's objections exculpatory.  For example, Ms. Oliveira objected on to the phrase "WIXEN'S TRADE SECRETS" "to the extent" that the information defined as a trade secret was not a "bonafide" [*sic*] trade secret.  The objection fundamentally changes the nature of the Request, the point of which was to ascertain not Ms. Oliveira's access to "business information," but her access to trade secrets.

showed was that Ms. Oliveira **never told them** their termination notices were untimely. Instead on March 4, well after termination notices were due, Ms. Oliveira emailed Bruce Gaitsch and Janey Clewer advising them to terminate. Ms. Oliveira's actions are even more egregious with respect to clients Bruce Gaitsch and Janey Clewer, who mMs. Oliveira emailed on March 4, 2021, providing contact information for Mr. Dreith and advising "[i]f you want to jump from Wixen to Transparence, you'll need to email me a termination by April 1." (May 8, 2024, Transcript, (PM Session) at 69:4; 70:9- 71:24;Trial Ex. 21).

Ms. Oliveira's qualification of her response attempts to characterize her efforts in backdating termination notices as an innocent accommodation at the request of two clients. But the facts prove her "assistance" to be much more involved and, critically, that her intent in forging the termination notices was to facilitate poaching of Wixen's clients by TEG, and by extension, her illicit use of Wixen's trade secrets. Ms. Oliveira did not object to Request No. 9, and as her qualifications are a clear attempt to recharacterize the Request in a self-serving way that she could not have legitimately expected to prove.

### D. Ms. Oliveira's Qualifications Regarding Emailing Trade Secrets to Herself Were Proven False.

Request No. 10 asked Ms. Oliveira to admit that she had emailed Wixen's trade secrets to herself. As with Request No. 3, Ms. Oliveira objected to the phrase "WIXEN'S TRADE SECRETS" "to the extent" that the alleged trade secrets were not trade secrets. Ms. Oliveira therefore admitted only to "from time to time" emailing "certain limited client information" to herself, solely to "perform her duties," out of necessity due to Wixen's "unreliable" computer system. Ms. Oliveira's refusal to admit that the material she emailed herself was a trade secret fundamentally changes the nature of the Request from one directed to a central issue in the case, namely Ms. Oliveira's acquisition of trade secrets to one to an email in which she simply ignores the central issue of trade secret acquisition.

Moreover, Ms. Oliveira's attempt to qualify her admission was proven false at trial. Contrary to her assertion that she emailed small, limited amounts of information simply for the purpose of working around an allegedly faulty computer system, the unchallenged evidence was that Wixen discovered that Ms. Oliveira used a file transfer program in February and March 2021, to email herself "multiple terabytes" of Wixen data. (May 8, 2024 Transcript, Vol I at 33:17-62:21, 108:13-109:5; May 8, 2024 Transcript (PM Session) at 9:17-10:2; May 9, 2024 Transcript, Vol I at 32:10-23; 46:15- 58:1; Trial Exs. 36, 76, 99). Although at trial Ms. Oliveira attempted to characterize this massive volume of material as purely personal, she was repeatedly impeached, having previously testified under oath that she was unable to identify the material she sent herself using WeTransfer. (May 8, 2024 Transcript, Vol I at 33:17-62:21, 108:13-109:5; May 9, 2024 Transcript, Vol I at 32:10-23; 46:15-58:1; Trial Exs. 36, 76). In the last weeks of her employment with Wixen, Ms. Oliveira also emailed herself numerous emails containing contract termination dates for various clients, client names and contact information, and information about client revenues and earnings. (May 8, 2024 Transcript, Vol I at 33:17-62:21; May 9, 2024 Transcript, Vol I at 32:10-34:12, 46:15- 58:1; Trial Exs. 32, 36, 76, 99). For example, on the same day Ms. Oliveira contacted poaching prospect Jim Keltner and discussed TEG with him, she also emailed herself Mr. Keltner's earnings for the previous year. (May 9, 2024 Transcript, Vol I at 29:18, 30:9, 31:17-32:23; Trial Ex. 18, 24, 76). Ms. Oliveira also went to significant effort to hide this behavior by destroying the evidence of her emails and file transfers, which were discovered only when a routine check of Ms. Oliveira's former laptop revealed a trove of incriminating emails that Ms. Oliveira had attempted to delete. (May 7, 2024 Transcript, Vol. II at 30:17-31:1; 31:10-32:17; Trial Ex. 72). Ms. Oliveira's efforts to destroy the evidence of her misbehavior makes clear both that Ms. Oliveira was well aware that the material she was emailing to herself consisted of sensitive trade secrets, and also, that her Response's qualification of her actions as simply "limited amounts of client information" purely to perform her

duties for Wixen, is little more than a flimsy attempt at evasion.  Given the massive amounts of information transferred to her personal email in the last weeks of her employment, Ms. Oliveira could not reasonably have expected the Court and the jury to come to any conclusion other than that her Response was untrue.

### E.   Wixen Disproved Defendants' Denials of Contact with Wixen Clients for the Purpose of Solicitation

Both Ms. Oliveira and TEG flatly denied that they contacted Wixen's clients for the purpose of solicitation.  However, at trial, documentary evidence was offered showing large numbers of emails by Ms. Oliveira either seeking to "talk about your options" or set up appointments for phone calls with Wixen's clients for no apparent purpose. (May 9, 2024 Transcript, Vol I at 22:9-29:14; 29:18-30:8; 31:10-32:9, 37:4-38:21; 46:15-58:1 Trial Ex. 13, 14, 16, 18, 19, 24, 26, 76). Although Ms. Oliveira asserted at trial that she was seeking to inform clients of their "options" with respect to their new Wixen client representative, the jury disbelieved this explanation as it found that Ms. Oliveira not only misappropriated Wixen's trade secrets by acquisition, but also by use. (ECF 220, Verdict Forms No. 1A-1C).

Even more incriminatory are a series of emails where Ms. Oliveira's efforts to solicit Wixen's clients actually succeeded. In a series of emails sent to Wixen clients Mick Lister, the heirs of Emil Radicchio, and to Janey Clewer and Bruce Gaitsch, Ms. Oliveira's vague references to "options" are laid bare for what they actually were— attempts to solicit clients for TEG. For example, Trial Exhibit 24 consists of an email string to the heirs of Emil Radocchia, which Ms. Oliveira initiated on February 22, 2021, announcing she has been "headhunted" by TEG and seeking a phone call to "explain your options." (May 9, 2024 Transcript, Vol. 1 at 26:6-27:3, 31:3-12; Trial Ex. 24). Two days later, one of the heirs – Celeste Radocchia—emails Ms. Oliveira, confirming that following their phone call she has investigated TEG and "would like to use their services."  (Trial Ex. 24). She goes on to suggest that Ms. Oliveira contact three other Wixen clients about switching representation.  The next day, February 25,

Ms. Oliveira responds, providing contact information for Defendant Dennis Dreith, suggested language for communicating the contract termination to Wixen, and informing Ms. Radocchia of the deadline to send the email. *Id.* It is undeniable that this email is a solicitation on behalf of TEG.

Ms. Oliveira then proceeds to confirm that, per Ms. Radocchia's suggestion of the prior day, "I have phoned Jim Keltner, and he is weighing up his options." *Id.* Although initially denying the import of this email, Ms. Oliveira ultimately begrudgingly admitted at trial, to having spoken to Mr. Keltner about TEG. (May 9, 2024 Transcript, Vol. 1 at 31:17-32:9; Trial Ex. 24). Ms. Oliveira's actions are even more egregious with respect to clients Bruce Gaitsch and Janey Clewer, whom Ms. Oliveira emailed on March 4, 2021, providing contact information for Mr. Dreith and advising "[i]f you want to jump from Wixen to Transparence, you'll need to email me a termination by April 1." (May 8, 2024, Transcript, (PM Session) at 69:4; 70:9-71:24;Trial Ex. 21).

This evidence clearly and undeniably proves Ms. Oliveira's denial of having solicited Wixen's clients false. Importantly, the jury found that in undertaking the misappropriation of Wixen's trade secrets, Ms. Oliveira was acting as TEG's agent by ratification. (ECF 220, Verdict Form No. 5). **This necessarily also renders TEG's denial false**, since all of Oliveira's illegal actions in this matter are attributable to TEG. *Daniels v. Select Portfolio Servicing, Inc.,* 246 Cal.App.4th 1150,1172 (Cal. Ct. App. 2016) ("[A] principal is liable to third parties . . . for the frauds or other wrongful acts committed by [its] agent in and as a part of the transaction of" the business of the agency.")

Although the jury found that Ms. Oliveira was acting as TEG's agent, she was not the only defendant to have emailed a Wixen client for the purpose of solicitation. For example on February 13, 2021, Dennis Dreith, whom Defendants stipulated was an agent of TEG, emailed then Wixen client Steve Nathan, "If you are interested in

coming on board with TEG, this would be a great time to start the process with Tania." (May 10, 2024 Transcript, Vol 1 at 50:23-51:16, Trial Ex. 48).

Defendants' solicitous communications were of significant importance to the case, since they demonstrated a basis for damages, as well as the Defendants' improper use and acquisition of trade secrets. Neither TEG nor Ms. Oliveira objected to these Requests, and given that the Requests relate to Defendants own clear cut communications, Oliveira or TEG could not expect their denials of these requests to stand at trial.

**F.     The Court Should Award Attorney's Fees Under the DTSA and the CUTSA**

Under the DTSA, the court may "award reasonable attorney's fees to the prevailing party" if "the trade secret was willfully and maliciously misappropriated." 18 U.S.C. § 1836(b)(3)(D). Similarly, California, which has adopted the Uniform Trade Secrets Act, provides that if "willful and malicious misappropriation exists" the Court may award attorney's fees to the prevailing party. Cal. Civ. Code § 3426.5. It is undeniable that Plaintiff meets the first prong of the DTSA and the CUTSA and stands as the prevailing party in this matter, as the jury concluded that all Defendants misappropriated Wixen Trade Secrets Nos. 1 and 2 by acquisition and use and Trade Secret No. 3 by acquisition and that Defendant Tania Oliveira misappropriated Wixen Trade Secrets Nos. 1, 2 and 3 by disclosure. (ECF 220, Verdict Forms No. 1A-1C).

Defendants will likely argue that Plaintiff cannot satisfy the second prong of the fee shifting provisions because in determining whether to award punitive damages, the jury concluded that Defendants did not act "willfully and maliciously" by clear and convincing evidence. (ECF 215, Jury Instr.4; ECF 220, Verdict Form No. 7). The standard of proof here, however, is significantly lower. both the DTSA and the CUTSA call for a finding of willful and malicious acts, but not by clear and convincing evidence; rather, both statutes provide that the award of fees lies within the discretion of the court. 18 U.S.C. § 1836(b)(3)(D); Cal. Civ. Code § 3426.5.

Further, neither statute sets out a specific burden of proof for a finding of willful and malicious acts for the purpose of an award of attorney's fees.

Punitive damages "serve the same purposes as criminal penalties by punishing and deterring conduct that is deemed particularly reprehensible and poses a substantial risk of harm to the general public." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 959 (N.D. Cal. 2007). Accordingly, such awards are subject to the due process clause of the Fourteenth Amendment, and to ensure against awards of punitive damages that are arbitrary or capricious a higher burden of proof is appropriate. *Cameron v. Las Orchidias Properties, LLC*, 82 Cal. App. 5th 481, 522 (2022). In contrast, an award of attorney's fees under the CUTSA and the DTSA is not intended to be punitive in nature. Rather, in the context of a trade secret action, "the basic purpose of attorney fees is to indemnify the prevailing party and not to punish the losing party by allowing the winner a windfall of profit." *ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1185–86 (10th Cir. 2011) [*"ClearOne"*] (decided under the Utah Uniform Trade Secrets Act). In cases where a "well-funded" defendant is found to have committed an "acts of misappropriation that undermine legitimate competition and innovation," the purpose of an award of attorney's fees is inherently an equitable one. *Mattel, Inc. v. MGA Ent., Inc.*, 801 F. Supp. 2d 950, 956 (C.D. Cal. 2011). Where, as in this case, a plaintiff files suit promptly upon learning of the misappropriation, the actual damages are often low. Therefore, an award of attorney's fees is necessary, lest the substantial cost of litigation become an economically insurmountable hurdle against preventing trade secret theft.

In *Clear One, supra,* the 10th Cir. addressed an apparently novel question: the burden of proof required to prove malice and willfulness in order to recover attorney's fees. Although ruling that the defendant had waived any error arising from an instruction that the jury should determine willfulness and malice by a preponderance of the evidence, the 10th Circuit also distinguished the underlying equitable purpose

of an attorney's fees award to make a successful plaintiff whole, from the penalizing purpose served by exemplary damages. *ClearOne,* 653 F.3d at 1185.

The *ClearOne* court also identified additional support for its reasoning in the committee commentary to section 4 of the Uniform Trade Secrets Act, which "expressly incorporates" the provisions of 35 U.S.C § 285, the patent law fee shifting provision, "explaining that 'patent law is followed in allowing the judge to determine whether attorney's fees should be awarded even if there is a jury.'" *ClearOne,* 653 F.3d at p. 1186 (quoting Unif. Trade Secrets Act § 4 cmt). Section 285, *ClearOne* noted, is a "compensatory rather than punitive" provision that allows a Court to award attorney's fees in certain cases. *Id.*

*ClearOne's* reasoning is further bolstered by the U.S. Supreme Court's 2014 decision in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.,* 572 U.S. 545, 557 (2014), which expressly rejected the contention that an award of fees under section 285 required patent litigants to establish their entitlement to fees by clear and convincing evidence:

> And nothing in § 285 justifies such a high standard of proof. Section 285 demands a simple discretionary inquiry; it imposes no specific evidentiary burden, much less such a high one. Indeed, patent-infringement litigation has always been governed by a preponderance of the evidence standard, see, e.g., and that is the standard generally applicable in civil actions, because it allows both parties to share the risk of error in roughly equal fashion.

*Id.* at p. 557-558 (quoting *Bene v. Jeantet*, 129 U.S. 683, 688 (1889) and *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983) (internal quotation marks omitted)).

Although *ClearOne* was decided with respect to the Utah Uniform Trade Secrets Act, the relevant portion of its attorney's fee shifting provision is identical to the CUTSA and the DTSA. "Because the CUTSA is derived from the national Uniform Trade Secrets Act, California courts consider case law from other jurisdictions applying similar sections of the Uniform Act." *Ajaxo, Inc. v. E*Trade Fin. Corp.,* 48 Cal. App. 5th 129, 161 n.9 (Cal. Ct. App. 2020). California courts also

"accord substantial weight" to the commissioners' comments on the construction of the Uniform Act, where, as here, the provisions of the Uniform Act were adopted essentially verbatim. *Cadence Design Sys., Inc. v. Avant! Corp.*, 29 Cal. 4th 215, 222 (2002). *ClearOne's* reasoning is appropriately applied in the present matter involving substantially identical provisions of the CUTSA and the DTSA. In deciding whether to award attorney's fees, the Court should therefore apply a preponderance of the evidence standard to the determination of malice and willfulness, rather than the clear and convincing evidence the jury was asked to apply with respect to punitive damages.

## G. Under a Preponderance of the Evidence Standard, Defendants' Conduct Was Willful and Malicious

There is more than sufficient evidence for the Court to determine by a preponderance of the evidence that Defendants acted willfully and maliciously. To demonstrate willful and malicious conduct, Plaintiff must demonstrate willful action (conduct with "a purpose or willingness to commit the act in question" and that "was not reasonable under the circumstance and was not undertaken in good faith") and malicious intent (i.e., that defendants either acted with an intent to cause injury, or that the conduct was despicable and done with a willful and knowing disregard for the rights of others). CACI No. 4411; 18 U.S.C. § 1836(b)(3)(C). Further, because the jury in this case found that Ms. Oliveira was TEG's agent, and because Ms. Hoffman and Mr. Dreith conceded their roles as agents of TEG, attorney's fees should be awarded against all the Defendants jointly and severally. (ECF 215, Jury Instr.18 (undisputed that Defendants Dreith and Hoffman were the agents of TEG); ECF 219, Verdict Form No. 5).

Defendants' actions Although Plaintiff will not belabor the point since the Court no doubt recalls much of the evidence, some of the more poignant evidence of willfulness and maliciousness include the following:

**1.** ***Clear knowledge of Ms. Oliveira's relationship with Wixen and her obligations regarding its trade secrets, along with attempts to deny such knowledge that were not credible***

Ms. Oliveira signed multiple agreements outlining her obligations regarding Wixen's trade secrets and her obligations regarding other employment posing a conflict of interest. (May 8, 2024 Transcript, (PM Session) at p. 42:5-45:12 Trial Exs. 4, and 6). Her obligations were also outlined in Wixen's employee handbook. (May 8, 2024 Transcript, (PM Session) at p. 42:5-45:12 Trial Ex. 6).Ms. Oliveira claimed she did not remember receiving Wixen's handbook and she did not understand the confidentiality obligations in her contract, but among the evidence offered at trial was a January 2, 2020 email from Sharon Wixen to Ms. Oliveira and a colleague instructing them to work on updates to both documents. (May 8, 2024 Transcript, (PM Session) at p. 42:5-45:12 Trial Exs. 4, 5, 6).

Additionally, Ms. Oliveira transmitted a copy of her Wixen employment agreement to TEG in January 2021, and **nearly identical language was subsequently incorporated into Ms. Oliveira's TEG agreement**. (May 8, 2024 Transcript, (PM Session) at p. 57:23-58:15, 61:9-63:2; May 9, 2024 Transcript, Vol 1 at 44:13-45:9; 58:2-24, May 10, 2024 Transcript, Vol. 1 at 92:16-95:12; Trial Exs. 4, 40 and 60). To compound matters, Ms. Hoffman testified—unbelievably—that the nearly word-for-word identical language was obtained from service called "LawDepot," but admitted she was unaware of any evidence beyond her own self-serving testimony to support this claim. (May 10, 2025 Transcript, Vol 1, at 106:12-15). It is clear, despite their disavows, **all Defendants** were well aware of Ms. Oliveira's obligations.

**2.** ***Attempts to hide Ms. Oliveira's employment with TEG and TEG's encouragement and participation in her efforts to use Wixen's trade secrets, which demonstrates recognition that the***

*activities were in violation of Wixen's rights, and conscious disregard of those rights.*

Ms. Oliveira admitted that she failed to disclose her conflicting TEG employment to Wixen. (May 8, 2024 Transcript, (PM Session) at 59:21-60:15; Ex. 40). Moreover, TEG required her to sign multiple NDAs. May 8, 2024 transcript, (PM Session) at 59:24-60:15; Trial Ex. 40). Further, both Mr. Dreith and Mr. Hoffman were aware of Ms. Oliveira's intentions to recruit Wixen clients, but admitted they never discouraged her poaching activities. (May 10, 2024 Transcript Vol. 1 at 49:19-50:22, 95:19, 98:23-99:3 Trial Ex. 60). To the contrary, the evidence shows that Mr. Dreith and Ms. Hoffman actually encouraged and assisted in these activities.

For example, in January 2021, Ms. Oliveira emailed Mr. Dreith and Ms. Hoffman the names of several Wixen clients and former clients, intimating she had the ability to poach them to TEG, and offered introductions to at least one. Rather than reminding Ms. Oliveira of her obligations, Ms. Hoffman appears to have actually encouraged Ms. Oliveira, responding: "awesome." (May 8, 2024 Transcript, (PM Session) at 61:9-13; 63:15-67:4; May 9, 2024 Transcript, Vol 1 at 42:10-44:1; 45:13-46:13; Trial Exs. 14, 37, 60).

Further, both Mr. Dreith and Ms. Hoffman directly assisted these efforts by following up with prospects identified by Ms. Oliveira, including Mr. Steve Nathan, Mr. Aynsley Dunbar, Janey Clewer and Bruce Gaitsch, and the heirs of Emil Radocchia, selling TEG to them as a "better route" and offering to do things such as assist clients with ghostwriting termination notices (something Plaintiff learned of only because Mr. Dreith inadvertently emailed Ms. Oliveira's former Wixen email address). (May 9, 2024 Transcript, Vol 1 at 15:20-17:18; 18:11-22:8, May 10, 2024 Transcript Vol. 1 at 45:6-47:16; Trial Exs. 48, 51, 82). No doubt, TEG had a leg up in selling its services, because not only did Ms. Oliveira provide information about clients and termination dates, she also transmitted information about client earnings. (May 8, 2024 (PM Session) Transcript at 63:15-64:10 65:7-67:13; Trial Ex. 99).

Further, even after learning of Ms. Oliveira's forgery of termination dates, in an email sent to one poached client (Bruce Gaitsch), Mr. Dreith minimizes Ms. Oliveira's actions as a mere "technicality." (May 10, 2024 Transcript, Vol 1 at 47:17-48:11; Trial Ex. 78).

> **3.    *Clear efforts by all Defendants to cover up their activities, both while they were underway and at trial, demonstrating knowledge that the activities were illicit, and intention to carry them out regardless in conscious disregard of Wixen's rights***

Multiple clients received emails from Ms. Oliveira setting up calls or offering to "talk about your options," a phrase which Ms. Oliveira unbelievably claimed referred to identifying who would handle a client's account after Ms. Oliveira's departure, despite the fact that there were no "options" in this regard for clients. (May 9, 2024 Transcript, Vol I at 22:9-29:14; 29:18-30:8; 31:10-32:9, 37:4-38:21; 46:1516-58:1 Trial Ex. 13, 14, 16, 18, 19, 24, 26, 76).

Ms. Oliveira went even further, actually ghostwriting termination emails for some clients, such as Mick Lister (May 9, 2024 Transcript, Vol 1 at 32:24-33:18; Ex. 73), and forging the dates of termination of multiple clients including Mick Lister and Janey Clewer and Bruce Gaitsch (May 8, 2024 Transcript, (PM Session) at 71:21-72:12; 73:2-75:14; 76:11-16; May 9, 2024 Transcript, Vol 1 at 32:24-37:3; Trial Exs. 27, 28, 29, 32, 33, 73). Furthermore, like Ms. Oliveira who attempted to cover up her misappropriation of Wixen's trade secrets by forging termination notices and attempting to disguise her efforts by vaguely inviting clients to discuss "options," TEG also attempted to hide its activities by claiming prior relationships with clients such as Aynsley Dunbar, a client Ms. Hoffman claimed to have known for at least a year before attempting to recruit him, despite not actually knowing his correct name and emailing him in January 2021 that it was nice to "e-meet you." (May 10, 2024 Transcript, Vol. 1 at 95:19-96:5; 99:4-102:11; 102:22-103:12; Trial Exs. 60, 98).

Furthermore, like Ms. Oliveira who attempted to cover up her misappropriation of Wixen's trade secrets by forging termination notices and attempting to disguise her efforts by vaguely inviting clients to discuss "options," TEG also attempted to hide its activities by claiming prior relationships with clients such as Aynsley Dunbar, a client Ms. Hoffman claimed to have known for at least a year before attempting to recruit him, despite not actually knowing his correct name and emailing him in January 2021 that it was nice to "e-meet you." (May 10, 2024 Transcript, Vol 1 at 95:19-96:5; 99:4-102:11; 102:22-103:12; Trial Exs. 60, 98)

Ms. Oliveira emailed herself "multiple terabytes" of Wixen data either directly to her personal email or using a service called WeTransfer, much of which she claims to be unable to identify, (and which also cannot be identified by Wixen), but which included among other things, contract termination dates for various clients, client names and contact information, and information about client revenues and earnings. (May 8, 2024 Transcript, Vol I at 33:17-62:21, 108:13-109:5; May 8, 2024 Transcript (PM Session) at 9:17-10:2; May 9, 2024 Transcript, Vol I at 32:10-23; 46:15- 58:1; Trial Exs. 36, 76, 99). To cover up this activity, Ms. Oliveira then attempted to delete the evidence from her computer. (May 7, 2024 Transcript, Vol II at 31:10-16; 32:3-17; 96:1-20).

## CONCLUSION

*"Flabbergasted, shocked, outraged, angry, and sad.  I went through so many emotions.  You know, we had worked so hard to do the right thing for our employees, to get this business going.  It just felt like a smack in the gut to know that this was going on."*

- Sharon Wixen describing her reaction to the discovery on March 22, 2021 that Tania Oliveira had been employed by competitor TEG since at least November 2020 under an NDA "basically agreeing that everything between them will be kept secret" and that her former laptop held a hidden trove of emails Ms. Oliveira had

attempted to delete in order to further disguise her activities.  (May 7, 2024 Transcript, Vol 1 at 32:12-17)

Caught misappropriating Wixen's trade secrets in 2021, Defendants have for more than three years consistently lied and attempted to deceive Plaintiff, this Court, and the jury to cover up their misappropriation. This behavior continued from before the litigation, during discovery, and through the trial. It forced Plaintiff to incur considerable costs to stop this behavior. Some costs, like the stress of trial, are not recoverable. However, Plaintiff respectfully asks that the Court reimburse it for the attorney's fees it incurred, as allowed by FRCP 37, the CUTSA and the DTSA.

Dated:  June 28, 2024

Respectfully submitted,

DONAHUE FITZGERALD LLP
Attorneys at Law

By: _____
Andrew S. MacKay
Kathleen B. Friend
Daniel J. Schacht
Padmini Cheruvu
Attorneys for Plaintiff Wixen Music UK Ltd.

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff Wixen certifies that this brief contains 6,754 words, which complies with the word limit of L.R. 11-6.1.

DATED: _June 28, 2024          /s/*Andrew S. MacKay*

_____

Andrew S. MacKay